Tina Wolfson (SBN 174806)
*twolfson@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone: 310.474.9111
Facsimile: 310.474.8585

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MALCOLM SCOTT, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FARMERS INSURANCE EXCHANGE, FARMERS GROUP, INC.,<br><br>Defendants. | Case No. 2:25-cv-8032<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Malcom Scott ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class" or "Class Members"), by and through his undersigned counsel, brings this class action complaint against Defendants Farmers Insurance Exchange and Farmers Group, Inc. (collectively, "Farmers" or "Defendants"). Plaintiff brings these allegations on information and belief, except the allegations specifically pertaining to himself, which are based on his personal knowledge. individually and on behalf of all others similarly situated ("Class members").

## NATURE OF THE ACTION

1. Plaintiff brings this class action individually and on behalf of all other individuals who had their sensitive personal information, including names, addresses, dates of birth, driver's license numbers, and/or partial Social Security numbers (collectively, "Personal Information") disclosed to unauthorized third parties during a data breach compromising Farmers in May 2025 (the "Data Breach").

2. Defendants Farmers Insurance Exchange and Farmers Group, Inc. "make up one of the country's largest insurers of vehicles, homes and small businesses." Defendants proudly serve millions of households and businesses across the entire United States, offering car, property, life, commercial and other types of insurance services and products.[1]

3. On May 30, 2025, Farmers discovered suspicious activity involving an unauthorized actor accessing one of Farmers' third-party vendor's databases containing Farmers customer information.[2]

4. According to the Notice of Security Incident published on Farmers' website, "the third-party vendor had monitoring tools in place, which allowed the vendor to

[1] https://www.farmers.com/about-us/ (last accessed August 25, 2025).

[2] *See* Farmers Notice of Security Incident, available at https://www.farmers.com/content/dam/farmers/marketing/digital/aem/pdfs/disclosures/notice-of-incident.pdf (last accessed August 25, 2025).

quickly detect the activity and take appropriate containment measures, including blocking the unauthorized actor."

5. Farmers launched an investigation to determine the nature and scope of the incident and notified appropriate law enforcement authorities. That investigation revealed that "an unauthorized actor accessed the vendor's database on May 29, 2025, and acquired certain data."[3]

6. According to Farmers, it began sending written notices to affected individuals on August 22, 2025, approximately three months after first learning about the Data Breach.[4]

7. The Data Breach reportedly impacted approximately 1.1 million individuals.[5]

8. Though Farmers represents it "takes protecting your personal information seriously" it provides a paltry amount of information concerning the breach on its website and does not position impacted customers to protect themselves against fraud and identity theft. Indeed, the website is clear that its customers (and perhaps others) may already be experiencing the fallout of the Data Breach, as it has provided a customer care toll-free number for customers to call with questions about the Data Breach.

9. Defendants were well aware of or should have known of their data security shortcomings. Defendants collect and maintain sensitive Personal Information about their customers and potential customers, including drivers' license numbers and Social Security numbers ("SSNs"). Defendants require customers to provide this information in connection with using Farmers' services.

---

[3] *Id.*

[4] *Id.*

[5] https://www.bleepingcomputer.com/news/security/farmers-insurance-data-breach-impacts-11m-people-after-salesforce-attack/ (last accessed August 25, 2025).

10. Defendants' failures to ensure that their servers and systems were adequately secure fell far short of its obligations and Plaintiff's and Class members' reasonable expectations for data privacy jeopardized the security of Plaintiff's and Class member's Personal Information, and exposed Plaintiff and Class members to fraud and identity theft or the serious risk of fraud and identity theft.

11. As a result of Defendants' conduct and the resulting Data Breach, Plaintiff and Class members' privacy has been invaded, their Personal Information is now in the hands of criminals, they have either suffered fraud or identity theft, or face an imminent and ongoing risk of identity theft and fraud. Accordingly, these individuals now must take immediate and time-consuming action to protect themselves from such identity theft and fraud.

## PARTIES

12. Plaintiff Malcolm Scott is a resident of Tampa, Florida. Plaintiff had an account with Farmers and/or its affiliates. Believing Farmers would implement and maintain reasonable security and practices to protect customer Personal Information, Plaintiff provided Personal Information to Farmers in connection with seeking insurance products and services from, and transacting with, Farmers.

13. Defendant Farmers Insurance Exchange is an unincorporated association organized under the California Insurance Code, with its principal place of business in Woodland Hills, California.

14. Defendant Farmers Group, Inc. is a corporation organized under the laws of the state of Delaware, with a principal place of business located in Woodland Hills, California. Farmers provides a wide range of products: auto, home, renters, life, and small business insurance, plus specialty coverage.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(a) and (d), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of five million

dollars ($5,000,000.00), there are in excess of 100 Class members, the action is a class action in which one or more Class members are citizens of states different from Defendants.

16. The Court has personal jurisdiction over Defendants because they maintain their headquarters and principal places of business in this District and conduct significant business in this District, thus availing themselves of California's markets by selling auto insurance policies therein; they have sufficient minimum contacts with California; and a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District.

17. Venue properly lies in this District pursuant to 28 U.S.C. § 1391 because, *inter alia*, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in, were directed to, and/or emanated from this District; Defendants transact substantial business and have agents in this District; a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District; and because Defendants' corporate headquarters are located within this District.

## FACTUAL ALLEGATIONS

### A. Farmers Collects and Stores Personal Information

18. Farmers routinely collects sensitive Personal Information in the process of providing a wide range insurance services and products, which include auto, home, renters, life, and small business insurance, plus specialty coverage.[6]

19. This information includes, on information and belief, "phone book" information such as names, email addresses, phone numbers, mailing addresses, but also includes highly sensitive information including SSNs, financial information, tax information, credit history, employment information, drivers' license information, insurance information, and other highly sensitive information. Some or all of this information is typically provided to an insurer when a consumer is attempting to secure insurance products and services. As a result, insurers like Defendants collect and maintain

[6] https://www.farmers.com/about-us/ (last accessed August 25, 2025).

large amounts of highly sensitive Personal Information received during the insurance application processes.

20. Farmers is and was aware of the sensitive nature of the Personal Information it collects, and it acknowledges the importance of data privacy. In its Privacy Notice on its website, Farmers represents: "our customers are our most valued assets. Protecting your privacy is important to us."[7]

21. The Privacy Notice also identifies the policies and procedures Farmers purportedly employs to protect sensitive Personal Information:

> We restrict access to personal information to those individuals, such as our employees and agents, who provide you with our products and services. We require individuals with access to your information to protect it and keep it confidential. We maintain physical, electronic, and procedural safeguards that comply with applicable regulatory standards to guard your nonpublic personal information. We do not disclose any nonpublic personal information about you except as described in this notice or as otherwise required or permitted by applicable law.[8]

22. The Privacy Notice is clear that it was aware of the need to safeguard the sensitive Personal Information entrusted to it by consumers as part of the insurance application process.

**B. The Data Breach**

23. On May 30, 2025, Farmers discovered suspicious activity involving an unauthorized actor accessing one of Farmers' third-party vendor's databases containing Farmers customer information.[9]

---

[7] *Id.*

[8] https://www.farmers.com/content/farmers/marketing/digital/aem/pdfs/privacy-center/Farmers-Privacy-Notice.pdf (last accessed August 25, 2025).

[9] *See* Farmers Notice of Security Incident, available at https://www.farmers.com/content/dam/farmers/marketing/digital/aem/pdfs/disclosures/notice-of-incident.pdf (last accessed August 25, 2025).

24. According to the Notice of Security Incident published on Farmers' website, "the third-party vendor had monitoring tools in place, which allowed the vendor to quickly detect the activity and take appropriate containment measures, including blocking the unauthorized actor."

25. Farmers launched an investigation to determine the nature and scope of the incident and notified appropriate law enforcement authorities. That investigation revealed that "an unauthorized actor accessed the vendor's database on May 29, 2025, and acquired certain data."[10]

26. According to Farmers, it began sending written notices to affected individuals on August 22, 2025, approximately three months after first learning about the Data Breach.[11]

**C. <u>Impact of the Farmers Data Breach</u>**

27. The actual extent and scope, and the impact, of the Data Breach on Defendants' customers (or other affiliated persons) remains uncertain. Unfortunately for Plaintiff and Class members, the damage is already done because their sensitive Personal Information is confirmed by Farmers to have been disclosed to unauthorized persons during the Data Breach.

28. Defendants knew or should have known that their IT systems and/or servers are unsecure and do not meet industry standards for protecting highly sensitive customer Personal Information. On information and belief, Defendants failed to timely make changes to their data security systems, privacy policies, and their IT systems and servers, exposing their customers' Personal Information to the risk of theft, identity theft, and fraud.

29. Some of the harm caused to Plaintiff and Class members by the Data Breach has already been suffered, with additional harm imminent in the wake of the Data Breach.

---

[10] *Id.*

[11] *Id.*

30. The Data Breach creates a heightened security concern for Plaintiff and Class members because their SSNs, financial information, and other sensitive information was potentially disclosed. Theft of SSNs creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of his SSN, and a new SSN will not be provided until after the harm has already been suffered by the victim.

31. Given the highly sensitive nature of SSNs, theft of SSNs in combination with other personally identifying information (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. Per the United States Attorney General, Social Security numbers "can be an identity thief's most valuable piece of consumer information."[12] TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you don't have a credit freeze yet, you're easy pickings."[13]

32. In addition, threat actors seek out driver's license numbers because they are highly valuable pieces of personal information. A driver's license number can be a critical part of a fraudulent, synthetic identity, with reports indicating that the going rate for a stolen identity is about $1,200 on the dark web, and that a stolen or forged driver's license,

---

[12] *Fact Sheet: The Work of the President's Identity Theft Task Force*, DEP'T OF JUSTICE, (Sept. 19, 2006), https://www.justice.gov/archive/opa/pr/2006/September/06_ag_636.html.

[13] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (August 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

alone, can sell for around $200.[14] Driver's license numbers are particularly useful to identity thieves for applying for unemployment or other government benefits.

33. Farmers had a duty to keep Plaintiff's and Class members' Personal Information confidential and to protect it from unauthorized disclosures. Plaintiff and Class members provided their Personal Information to Farmers with the understanding that Farmers would comply with its Privacy Notice and its obligations to keep such information confidential and secure from unauthorized disclosures.

34. Defendants' data security obligations were particularly important given the substantial increase in data breaches in recent years, which are widely known to the public and to anyone in Defendants' industry.

**D. Theft of Personal Information Has Serious Consequences for Victims**

35. Data breaches are by no means new and they should not be unexpected. Business Insider has noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers. . . . Many of them were caused by flaws in . . . systems either online or in stores."[15] It is well known amongst companies that store sensitive personally identifying information that sensitive Personal Information—like SSNs, financial information, tax information, etc.—is valuable and frequently targeted by criminals.

36. These types of attacks should be anticipated by companies that store sensitive and personally identifying information, like Farmers, and these companies must ensure that data privacy and security practices and protocols are adequate to protect against and prevent known and expected attacks.

---

[14] Lee Mathews, *Hackers Stole Customers' License Numbers From Geico In Months-Long Breach,* FORBES (Apr. 20, 2021), https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=146576a68658.

[15] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER (Nov. 19, 2019), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1 (last accessed Jan. 23, 2024).

37. Theft of Personal Information is serious. The Federal Trade Commission has warned consumers that identity thieves use Personal Information to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[16]

38. Indeed, with access to an individual's Personal Information, criminals can do more than simply empty a victim's bank account. They can also commit all manner of fraud, including: obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and SSN to obtain government benefits; obtain lending or lines of credit; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[17]

39. According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; use the victim's information in the event of arrest or court action.[18]

---

[16] *See* Federal Trade Commission, *What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Jan. 23, 2024).

[17] *See* FEDERAL TRADE COMMISSION, WARNING SIGNS OF IDENTITY THEFT, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed Jan. 23, 2024).

[18] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN, (May 21, 2023),

40. Personal Information is a valuable property right.[19] The value of sensitive personal information as a commodity is measurable.[20] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[21]

41. Personal Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the dark web and the "cyber black-market" for years. As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen SSNs, financial information, driver's license numbers, and other Personal Information directly on various illegal websites making the information publicly available, often for a price. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

42. Identity theft victims are frequently required to spend many hours and large amounts of money repairing the impact to their credit. Identity thieves use stolen personal

---

https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/ (last accessed Jan. 23, 2024).

[19] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[20] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[21] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

information for a variety of crimes, including credit card fraud, tax fraud, phone or utilities fraud, and bank/finance fraud.

43. Consumers place a high value on the privacy of sensitive data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[22]

44. There may be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[23]

45. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' Personal Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

46. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[24]

47. It is within this context that Plaintiff and all other Class members must now live with the knowledge that their Personal Information is forever in cyberspace and was

---

[22] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[23] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

[24] Identity Theft Resource Center, *2021 Consumer Aftermath Report*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/.

taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black-market.

**E. Farmers Failed to Act in the Face of a Known Risk of a Data Breach**

48. Despite the known risk of data breaches and the widespread publicity and industry alerts regarding other notable (similar) data breaches, Defendants failed to take reasonable steps to adequately protect Personal Information, leaving their clients (and potentially others) exposed to risk of fraud and identity theft.

49. Farmers is, and at all relevant times has been, aware that the sensitive Personal Information it handles and stores in connection with providing insurance services and products is highly sensitive. As a company that provides requires highly sensitive and identifying information in connection with providing insurance products and services, Farmers is aware of the importance of safeguarding that information and protecting its systems and products from security vulnerabilities.

50. Farmers was aware, or should have been aware, of regulatory and industry guidance regarding data security, and was alerted to the risk associated with failing to ensure that Personal Information was adequately secured.

51. Despite the well-known risks of hackers and cybersecurity intrusions, Farmers failed to employ (and/or failed to ensure its third-party vendors employed) adequate data security measures or in a meaningful way in order to prevent breaches, including the Data Breach.

52. The security flaws inherent to Defendants' or their vendors' IT systems or servers run afoul of industry best practices and standards. Had Defendants adequately protected and secured their servers or systems, and the sensitive Personal Information stored therein, Defendants could have prevented the Data Breach.

53. Despite that Farmers was on notice of the very real possibility of data theft, Farmers permitted a massive intrusion to occur that resulted in disclosure of Plaintiff's and nearly 1.1 million other Class members' Personal Information to criminals.

54. Defendants permitted Class members' Personal Information to be compromised and disclosed to criminals by failing to take reasonable steps against an obvious threat.

55. Industry experts are clear that a data breach is indicative of data security failures. Indeed, industry-leading research and advisory firm Aite Group has identified that: "If your data was stolen through a data breach that means you were somewhere out of compliance" with payment industry data security standards.[25]

56. As a result of the events detailed herein, Plaintiff and Class members suffered harm and loss of privacy, and will continue to suffer future harm, resulting from the Data Breach, including but not limited to: invasion of privacy; loss of privacy; loss of control over personal information and identities; fraud and identity theft; unreimbursed losses relating to fraud and identity theft; loss of value and loss of possession and privacy of Personal Information; harm resulting from damaged credit scores and information; loss of time and money preparing for and resolving fraud and identity theft; loss of time and money obtaining protections against future identity theft; and other harm resulting from the unauthorized use or threat of unauthorized exposure of Personal Information.

57. Victims of the Data Breach have likely already experienced harms and are subject to an imminent and ongoing risk of harm, including identity theft and fraud.

58. As a result of Defendants' failure to ensure that the impacted systems and servers were protected and secured, the Data Breach occurred. As a result of the Data Breach, Plaintiff's and Class members' privacy has been invaded, their Personal Information is now in the hands of criminals, they face a substantially increased risk of identity theft and fraud, and they must take immediate and time-consuming action to protect themselves from such identity theft and fraud.

[25] Lisa Baertlein, *Chipotle Says Hackers Hit Most Restaurants in Data Breach*, REUTERS (May 30, 2017), https://www.reuters.com/article/idUSKBN18M2BY/.

## CLASS ALLEGATIONS

59. Plaintiff brings this action on behalf of himself and the following Class pursuant to Federal Rule of Civil Procedure 23(a) and (b):

> All residents of the United States who were impacted by the Farmers Data Breach announced on or about August 22, 2025, including all persons who were sent notice by Farmers that their Personal Information was compromised as a result of the Data Breach.

60. Excluded from the Class are: (1) any Judge presiding over this action, members of their immediate families, and Court Staff; and (2) Defendants, their subsidiaries, parent companies, successors, predecessors, and any entity in which Defendants, or their parents, have a controlling interest, and their current or former officers and directors.

61. **Numerosity**: While the precise number of Class members has not yet been determined, members of the Class are so numerous that their individual joinder is impracticable, as the proposed Class appears to include approximately 1.1 million members who are geographically dispersed.

62. **Typicality**: Plaintiff's claims are typical of Class members' claims. Plaintiff and all Class members were injured through Defendants' uniform misconduct, and Plaintiff's claims are identical to the claims of the Class members they seek to represent. Accordingly, Plaintiff's claims are typical of Class members' claims.

63. **Adequacy**: Plaintiff's interests are aligned with the Class Plaintiff seeks to represent, and Plaintiff has retained counsel with significant experience prosecuting complex class action cases, including cases involving alleged privacy and data security violations. Plaintiff and undersigned counsel intend to prosecute this action vigorously. The Class's interests are well-represented by Plaintiff and undersigned counsel.

64. **Superiority**: A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiff's and other Class member's claims. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be

very difficult if not impossible for Class members individually to effectively redress Defendants' wrongdoing. Even if Class members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

65. **Commonality and Predominance:** The following questions common to all Class members predominate over any potential questions affecting individual Class members:

- whether Defendants engaged in the wrongful conduct alleged herein;
- whether Defendants' data security practices resulted in the disclosure of Plaintiff's and other Class members' Personal Information and the Data Breach;
- whether Defendants violated privacy rights and invaded Plaintiff's and Class members' privacy; and
- whether Plaintiff and Class members are entitled to damages, equitable relief, or other relief and, if so, in what amount.

66. Given that Defendants engaged in a common course of conduct as to Plaintiff and the Class, similar or identical injuries and common law and statutory violations are involved, and common questions outweigh any potential individual questions.

67. **Injunctive and Declaratory Relief:** Consistent with Fed. R. Civ. P. 23(b)(2), Defendants, through their conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

## CAUSES OF ACTION

### COUNT I
### Negligence

68. Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

69. Defendants were entrusted with, stored, and otherwise had access to the Personal Information of Plaintiff and Class members.

70. Defendants knew, or should have known, of the risks inherent to storing the Personal Information of Plaintiff and Class members, and to not ensuring that their or their vendors' servers and systems, and the Personal Information, were secure. These risks were reasonably foreseeable to Defendants.

71. Defendants owed duties of care to Plaintiff and Class members whose Personal Information had been entrusted to them.

72. Defendants breached their duties to Plaintiff and Class members by failing to provide fair, reasonable, or adequate data security. Defendants had a duty to safeguard Plaintiff's and Class members' Personal Information and to ensure that they adequately protected Personal Information. Defendants breached this duty.

73. Farmers' duty of care arises from its knowledge that its customers entrust it with highly sensitive Personal Information that Farmers is required to, and represents that it will, handle securely. Indeed, on its website, Farmers commits to data privacy in its Privacy Notice, including safeguarding sensitive Personal Information.

74. Only Farmers was in a position to ensure that Farmers' and its third-party vendors' systems, servers, and services were sufficient to protect against breaches and the harms that Plaintiff and Class members have now suffered.

75. A "special relationship" exists between Defendants, on the one hand, and Plaintiff and Class members, on the other hand. Defendants entered into a "special relationship" with Plaintiff and Class members by agreeing to accept, store, and have access to sensitive Personal Information provided by Plaintiff and Class members in

connection with their attempts or efforts to secure insurance.

76. But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class members, Plaintiff and Class members would not have been injured.

77. Defendants acted with wanton disregard for the security of Plaintiff's and Class members' Personal Information.

78. The injury and harm suffered by Plaintiff and Class members was the reasonably foreseeable result of Defendants' breach of duties. Defendants knew or should have known it was failing to meet these duties, and that Defendants' breach would cause Plaintiff and Class members to experience the foreseeable harms associated with the exposure of their Personal Information.

79. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class members have been harmed and face an imminent and ongoing risk of harm.

80. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class members have suffered injury and are entitled to damages in an amount to be proven at trial.

**COUNT II**
**Negligence Per Se**

81. Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

82. Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Farmers had a duty to provide adequate data security practices in connection with safeguarding Plaintiff's and Class members' Personal Information.

83. Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Farmers had a duty to provide adequate data security practices to safeguard Plaintiff's and Class members' Personal Information.

84. Farmers breached its duties to Plaintiff and Class members under the Federal Trade Commission Act (15 U.S.C. § 45), the Gramm-Leach-Bliley Act (15 U.S.C. §§ 6801, *et seq.*) ("GLBA"), the Driver's Privacy Protection Act, 18 U.S.C. §§ 2724, *et seq.*

("DPPA"), among other statutes, by failing to provide fair, reasonable, or adequate data security in connection with the sale of insurance products and services in order to safeguard Plaintiff's and Class members' Personal Information.

85. Defendants' failure to comply with applicable laws and regulations constitutes negligence per se.

86. But for Defendants' wrongful and negligent breach of duties owed to Plaintiff and Class members, Plaintiff and Class members would not have been injured.

87. The injury and harm suffered by Plaintiff and Class members was the reasonably foreseeable result of Defendants' breach of duties. Defendants knew or should have known that they were failing to meet their duties, and that a breach would cause Plaintiff and Class members to experience the foreseeable harms associated with the exposure of their Personal Information.

88. As a direct and proximate result of Defendants' negligence per se, Plaintiff and Class members have been harmed and face an imminent and ongoing risk of harm.

89. As a direct and proximate result of Defendants' negligence per se, Plaintiff and Class members have suffered injury and are entitled to damages in an amount to be proven at trial.

## COUNT III
## Breach of Implied Contract

90. Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

91. Farmers provided or provides insurance products and services to Plaintiff and Class members, or Plaintiff and Class members provided their Personal Information to Farmers as prospective customers or in some other capacity.

92. In connection with their business relationship, Plaintiff and Class members entered into implied contracts with Farmers.

93. Pursuant to these implied contracts, Plaintiff and Class members provided Farmers with their Personal Information. In exchange, Farmers agreed, among other

things: (1) to take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' Personal Information; and (2) to protect Plaintiff's and Class members' Personal Information in compliance with federal and state laws and regulations and industry standards.

94. The protection of Personal Information was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and Farmers, on the other hand. Had Plaintiff and Class members known that Farmers would not adequately protect its customers' Personal Information they would not have done business with Farmers.

95. Plaintiff and Class members performed their obligations under the implied contract when they provided Farmers with their Personal Information.

96. Necessarily implicit in the agreements between Plaintiff/Class members and Farmers was Farmers' obligation to take reasonable steps to secure and safeguard Plaintiff's and Class members' Personal Information.

97. Defendants breached their obligations under their implied contracts with Plaintiff and Class members by failing to implement and maintain reasonable security measures to protect their Personal Information.

98. Defendants' breach of their obligations of their implied contracts with Plaintiff and Class members directly resulted in the Data Breach.

99. The damages sustained by Plaintiff and Class members as described above were the direct and proximate result of Farmers' material breaches of its agreements.

100. Plaintiff and other Class members were damaged by Defendants' breach of implied contracts because: (i) they have suffered actual harm or identity theft; (ii) they face a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their Personal Information was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their Personal Information has been breached; (v) they were deprived of the value of their Personal Information, for which there is a well-established national

and international market; (vi) they were deprived of the benefit of their bargain; and/or (vii) they lost time and money incurred to mitigate and remediate the effects of the breach, including the increased risks of identity theft they face and will continue to face.

**COUNT IV**
**Breach of Fiduciary Duty**

101. Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

102. A relationship existed between Plaintiff and Class members and Defendants in which Plaintiff and Class members put their trust in Defendants to protect the Personal Information of Plaintiff and Class members and Defendants accepted that trust.

103. Defendants breached the fiduciary duties that they owed to Plaintiff and Class members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect the Personal Information of Plaintiff and Class members.

104. Defendants' breach of fiduciary duty was a legal cause of damage to Plaintiff and Class members.

105. But for Defendants' breach of fiduciary duty, the damage to Plaintiff and Class members would not have occurred.

106. Defendants' breach of fiduciary duty contributed substantially to producing the damage to Plaintiff and Class members.

107. As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiff are entitled to and demand actual, consequential, and nominal damages, and injunctive relief.

**COUNT V**
**Invasion of Privacy (Intrusion Upon Seclusion)**

108. Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

109. Plaintiff and Class members had a reasonable expectation of privacy in the

Personal Information that Defendants disclosed without authorization.

110. By failing to keep Plaintiff's and Class members' Personal Information safe, knowingly employing inadequate data privacy policies and protocols, and disclosing Personal Information to unauthorized parties for unauthorized use, Defendants unlawfully invaded Plaintiff's and Class members' privacy by, *inter alia*:

a. intruding into Plaintiff's and Class members' private affairs in a manner that would be highly offensive to a reasonable person; and

b. invading Plaintiff's and Class members' privacy by improperly using their Personal Information properly obtained for a specific purpose for another purpose, or disclosing it to some third party;

c. failing to adequately secure Personal Information from disclosure to unauthorized persons;

d. enabling the disclosure of Plaintiff's and Class members' Personal Information without consent.

111. Defendants knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiff's and Class members' position would consider its actions highly offensive.

112. Defendants knew that their IT systems and servers were vulnerable to data breaches prior to the Data Breach.

113. Defendants invaded Plaintiff's and Class members' right to privacy and intruded into Plaintiff's and Class members' private affairs by disclosing their Personal Information to unauthorized persons without their informed, voluntary, affirmative, and clear consent.

114. As a proximate result of such unauthorized disclosures, Plaintiff's and Class members' reasonable expectations of privacy in their Personal Information was unduly frustrated and thwarted. Defendants' conduct amounted to a serious invasion of Plaintiff's and Class members' protected privacy interests.

115. In failing to protect Plaintiff's and Class members' Personal Information,

and in disclosing Plaintiff's and Class members' Personal Information, Defendants acted with malice and oppression and in conscious disregard of Plaintiff's and Class members' rights to have such information kept confidential and private.

116. Plaintiff seeks injunctive relief on behalf of the Class, restitution, and all other damages available under this Count.

**COUNT VI**
**Unjust Enrichment**

117. Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

118. This claim is pleaded in the alternative to the implied contract claim.

119. Defendants have profited and benefited from the monies or fees paid and the Personal Information provided by Plaintiff and Class members to receive services from Defendants.

120. Defendants have voluntarily accepted and retained these profits and benefits with full knowledge and awareness that, as a result of the misconduct and omissions described herein, Plaintiff and Class members did not receive services of the quality, nature, fitness, or value represented by Defendants and that reasonable consumers expected.

121. Defendants have been unjustly enriched by its withholding of and retention of these benefits, at the expense of Plaintiff and Class members.

122. Equity and justice militate against permitting Defendants to retain these profits and benefits.

123. Plaintiff and Class members suffered injury as a direct and proximate result of Defendants' unjust enrichment and seek an order directing Defendants to disgorge these benefits and pay restitution to Plaintiff and Class members.

**COUNT VII**
**Violations of the California Unfair Competition Law,**
**Bus. & Prof. Code §§ 17200, *et seq.* (the "UCL")**

124. Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

125. Defendants' conduct constitutes unfair, illegal, and fraudulent business practices within the meaning of the California Business & Professions Code § 17200, *et seq*. (the "UCL").

126. Defendants' conduct violated certain laws as alleged herein, including the Federal Trade Commission Act (15 U.S.C. § 45), the Gramm-Leach-Bliley Act (15 U.S.C. §§ 6801, *et seq.*) ("GLBA"), and the Driver's Privacy Protection Act, 18 U.S.C. §§ 2724, *et seq.* ("DPPA"). By engaging in the said conduct in the course of doing business within California, Defendants engaged in unlawful business practices in violation of the UCL as to Plaintiff and all Class members.

127. By engaging in the above-described conduct in the course of doing business, Defendants engaged in unfair business practices in violation of the UCL because the harm to Plaintiff and Class Members outweighed any utility that Defendants' conduct may have produced.

128. Defendants' failure to disclose information concerning the Data Breach directly and promptly to affected customers constitutes a fraudulent act or practice in violation of the UCL. Defendants' failure to adequately protect Plaintiff's and Class members' Private Information, despite assurances they would do so and that Farmers met industry standards for data security, also constitutes a fraudulent act or practice in violation of the UCL.

129. Plaintiff and Class Members suffered injury in fact as a result of Defendants' conduct.

130. Individually and on behalf of the Class, Plaintiff seeks injunctive relief, restitution, and all other damages available under this cause of action.

## COUNT VIII
## Violations of the Driver's Privacy Protection Act, 18 U.S.C. §§ 2724, *et seq.* (the "DPPA")

131. Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

132. The DPPA provides that "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains . . . ." 18 U.S.C. § 2724.

133. The DPPA also restricts the resale and redisclosure of personal information, and requires authorized recipients to maintain records of each individual and the permitted purpose of the disclosure for a period of five years. 18 U.S.C. § 2721(c).

134. Under the DPPA, a "'motor vehicle record' means any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. § 2725(1). Driver's license numbers are motor vehicle records and "personal information" under the DPPA. 18 U.S.C. § 2725(3).

135. Pursuant to the allegations herein, Defendants knew or should have known that they obtained, disclosed or re-disclosed, and used PII from a motor vehicle record for a purpose not permitted under the DPPA.

136. By engaging in the conduct described above, Defendants knowingly obtained personal information for a purpose not permitted under the DPPA.

137. By engaging in the conduct described above, Defendants knowingly used personal information for a purpose not permitted under the DPPA.

138. By engaging in the conduct described above, Defendants knowingly disclosed or re-disclosed personal information for a purpose not permitted under the DPPA.

139. As a result of Defendants; acquisition, use, subsequent Data Breach, and violations of the DPPA, Plaintiff and putative Class members are entitled to statutory

damages to maximum allowable, actual damages, liquidated damages, and attorneys' fees and costs.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of the Class, by and through undersigned counsel, respectfully requests that the Court grant the following relief:

A. Certify this case as a class action pursuant to Fed. R. Civ. P. 23, and appoint Plaintiff as class representative and undersigned counsel as class counsel;

B. Award Plaintiff and Class members actual and statutory damages, punitive damages, and monetary damages to the maximum extent allowable;

C. Award declaratory and injunctive relief as permitted by law or equity to assure that Class members have an effective remedy, including enjoining Defendants from continuing the unlawful practices as set forth above;

D. Award Plaintiff and Class members pre-judgment and post-judgment interest to the maximum extent allowable;

E. Award Plaintiff and Class members reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Award Plaintiff and Class members such other favorable relief as allowable under law or at equity.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: August 25, 2025

Respectfully submitted,

*/s/ Tina Wolfson*

Tina Wolfson (SBN 174806)
*twolfson@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone: 310.474.9111
Facsimile: 310.474.8585

Bradley K. King (SBN 274399)

*bking@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone: 917.336.0171
Facsimile: 917.336.0177

John J. Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
280 South Beverly Drive
Beverly Hills, CA 90212
Telephone: 858-209-6941
jnelson@milberg.com

William “Billy” Peerce Howard (*pro hac vice* forthcoming)
**THE CONSUMER PROTECTION FIRM, PLLC**
401 East Jackson Street, Suite 2340
Truist Place
Tampa, FL 33602
Telephone: 813-500-1500
billy@TheConsumerProtectionFirm.com

*Attorneys for Plaintiff and the Proposed Class*